NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| EDWARD SALERNO, | : |
| | : Hon. Faith S. Hochberg, U.S.D.J. |
| Plaintiff, | : |
| | : Civil Case No. 06-3547 |
| v. | : |
| | : **OPINION** |
| JON CORZINE et al., | : |
| | : Date: October 1, 2013 |
| Defendants. | : |

| | |
|---|---|
| TERRY TRAYLOR, | : |
| | : |
| Plaintiff, | : |
| | : Civil Case No. 07-2751 |
| v. | : |
| | : |
| MERRILL MAIN et al., | : |
| | : |
| Defendants. | : |

**HOCHBERG, District Judge:**

Plaintiffs, Edward Salerno and Terry Traylor, are civilly confined at the Special Treatment Unit ("STU") in New Jersey pursuant to the New Jersey Sexually Violent Predators Act ("SVPA" or "the Act"), *N.J.S.A.* 30:4-27.24, *et seq.* As part of the program of treatment at the STU, residents are offered therapy programming in which they are encouraged to discuss their sexual histories and past sexual offenses. Residents who do not participate in therapy are denied certain privileges. Plaintiffs both allege that the conditioning of privileges on treatment violates their rights under the First Amendment. Defendants are various officials involved in the

treatment and confinement of Plaintiffs at the STU. This matter comes before the Court upon the Summary Judgment Motion filed by Defendants [Dkt. No. 66] and the Cross-Motion for Summary Judgment filed by Plaintiffs [Dkt. No. 72]. The Court held oral argument on this matter on September 17, 2013.

## I. BACKGROUND

A. *Procedural History*

In 2006, Mr. Salerno filed a *pro se* Complaint with this Court. That Complaint alleged that the named Defendants were "making threats to force plaintiff to give compelling self-incriminating statements," while in treatment at the STU through "the unlawful taking of personal property, denying the right to commissary and packages, and the taking away of institutional job." This Court interpreted the claims as alleging that the named Defendants violated his First and Fifth Amendment rights. It *sua sponte* dismissed Salerno's Fifth Amendment claim, and allowed the First Amendment claim to proceed. The named Defendants then filed a Motion to Dismiss, or in the alternative, for Summary Judgment. This Court treated the Motion as one for Summary Judgment. It granted judgment for all Defendants, finding that they were entitled to qualified immunity as "[t]here is no First Amendment right as applied in this case that is clearly established."

Mr. Traylor also filed a *pro se* Complaint in this district in 2007. Traylor's Complaint was based on the allegation that his First Amendment rights were violated because he was being forced to participate in treatment at the STU, and that he had been penalized for exercising his constitutional rights. The named Defendants in Traylor's case filed a Motion to Dismiss. The Honorable Dennis M. Cavanaugh, U.S.D.J., granted Defendants' Motion to Dismiss, on the basis that the named Defendants were entitled to qualified immunity because reasonable officials

would not consider self-accusatory sex offender treatment programs to be unconstitutional.

Both Plaintiffs filed an appeal from the District Court rulings. On appeal, the cases were consolidated.[1] In an Opinion filed on November 17, 2011, the United States Court of Appeals for the Third Circuit reversed in part and affirmed in part the judgment of the District Court on these cases. The Third Circuit affirmed the dismissal of Plaintiffs' damages claims under the doctrine of qualified immunity. However, the panel found that Salerno and Traylor had both brought claims for prospective relief, and that the District erred by granting qualified immunity to the named Defendants on those claims.[2] The Circuit "reversed[d] the District Court's orders dismissing Salerno's and Traylor's § 1983 claims for prospective relief [and] remand[e]d their claims to the District Court for further proceedings consistent with this opinion." *Salerno v. Corzine, et al.*, 449 F. App'x 118, 123 (3d Cir. 2011).

After the cases were remanded, they were consolidated before this Court. Plaintiffs moved for leave to amend their Complaints. The Magistrate Judge denied the Motion, on the basis that amending the Complaints would be beyond the mandate set forth by the Third Circuit. Plaintiffs appealed to this Court, which affirmed the ruling of the Magistrate Judge. The pending Motion and Cross-Motion for Summary Judgment followed. The Court then held oral argument.

---

[1] The United States Court of Appeals for the Third Circuit consolidated the matters of Plaintiffs Salerno and Traylor, as well as another Plaintiff, Joseph Aruanno. The District Court in the Aruanno case had dismissed his action under the doctrine of claim preclusion. The Third Circuit affirmed the District Court ruling as to Mr. Aruanno on that basis.

[2] The Third Circuit stated that Salerno and Traylor had not squarely raised this issue before the District Court, but considered it under its discretionary power to address issues raised for the first time on appeal. *Salerno*, 449 F. App'x at 123.

B.    *Statement of Material Facts*[3]

      1.    <u>The Treatment Program at the STU</u>

The SVPA provides for the civil commitment of "sexually violent predators who pose a danger to others should they be returned to society." *N.J.S.A.* 30:4-27.25.  The Act defines "sexually violent predators" as:

> [A] person who has been convicted, adjudicated delinquent or found not guilty by reason of insanity for commission of a sexually violent offense, or has been charged with a sexually violent offense but found to be incompetent to stand trial, and suffers from a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence if not confined in a secure facility for control, care and treatment.

*N.J.S.A.* 30:4-27.26.   Under the SVPA, the New Jersey courts may order the civil commitment of a person upon a finding after a hearing that the person "needs continued involuntary commitment as a sexually violent predator." *N.J.S.A.* 30:4-34.

Treatment for residents at the STU is provided by the Division of Mental Health Services in the New Jersey Department of Human Services.  Treatment is directly provided through "Treatment Teams" for each resident.  The residents of the STU are subject to certain rules, many of which are described by the *Residents' Guide to the STU, June 30 2006 Revision*.  The Guide lists five phases of treatment, and describes them as follows.  Phase I, "Orientation," is designed to familiarize residents with the STU, and the program of treatment, as well as to address the possible traumatic effects of involuntary commitment.  Phase II, "Rapport Building," encourages residents to recognize the need for changes in their behavior and attitudes.  Phase III, "Core/Intensive," is designed to ensure residents develop "greater stability in behavior, improved

---

[3]    The following facts are drawn from the undisputed facts described in Plaintiffs' Statement of Material Facts pursuant to Local Civil Rule 56.1, Defendants' Response to Plaintiffs' Statement of Material Facts, and the exhibits attached thereto.

tolerance for frustration, more pro-social behaviors, sounder affect management, and additional methods to control deviant sexual arousal." Phase IV, "Advanced/Honor," aims to ensure residents apply the lessons they have learned in earlier stages on a consistent basis. In Phase V, "Transition," residents earn greater privileges which may include unsupervised trips out of the grounds of the STU.

As residents progress through the phases, they are expected to discuss their sexual history and past sexual offenses. For example, in Phase 2, the resident must complete a "written, moderately detailed, rendition of the events surrounding at least one sexual offense" before moving to Phase 3. In Phase 3, the resident must "document[] and orally present[] a sexual offense history." Residents who "refuse to participate in treatment in a meaningful way," including refusing to "discuss significant topics," are put on "Treatment Probation." Residents who do not improve their participation in treatment are put on "Treatment Refusal status."

The STU distinguishes between "rights" and "privileges" that are available to residents. "Rights" include a radio, bedding, clothing, laundry, laundry soap, soap for bathing, a toothbrush, stamps, a television, and writing supplies. By contrast, institutional jobs, deodorant, earphones, audio equipment, clocks, and word processors are considered to be "privileges." Residents who are on "Treatment Refusal Status" are denied privileges. According to the Residents' Guide, this denial of privileges is intended to motivate participation in treatment. As an inducement to reconsider their decision not to participate, treatment refusers are offered the opportunity for two hours a week of paid institutional work if they attend a treatment orientation process group once a week for ninety minutes. This process group offers general mental health and wellness treatment rather than sex offender specific treatment. There have been instances where those who refused treatment for years "suddenly turn[ed] around" and began participating.

Those who do participate in treatment are offered one hour a day of paid work, five days a week, which increases by one hour a day as they progress through the phases of treatment.

2. Plaintiffs' Civil Commitment at the STU

Mr. Salerno completed his maximum criminal sentence in 2001. He was civilly committed under the SVPA, and has been a resident in the STU since completing his criminal sentence. He is now sixty-nine years old. Mr. Traylor, who is fifty-seven, is also civilly committed under the SVPA, and has been a resident at the STU since completing his maximum criminal sentence in 2002.

Both Salerno and Traylor are deemed to be "treatment refusers" by the officials at the STU. Both men have submitted affidavits that since they were committed to the STU, they have "declined" to participate in treatment sessions, and they refuse to discuss the crimes that led to their civil commitment or their sex lives. As a result of his treatment refusal status, Traylor has been denied a video game system, video games, a CD player, CDs, a cassette player, cassettes, a DVD player, DVDs, and an institutional job. Salerno has also been denied the same entertainment devices as Traylor. However, unlike Traylor, Salerno attends a Treatment Orientation group. As a result, Salerno is able to work at an institutional job for two hours a week, for a wage of $ 7.25 per hour. Both Plaintiffs remain in "Phase One" of the treatment program as a result of their refusal to participate in treatment.

Merrill Main, the STU Clinical Director, has testified that a resident refusal to participate in treatment negatively affects the "treatment milieu" at the STU because it encourages others to refuse treatment and affects the quality of participation of those who are engaging in the treatment process. Dr. Main also testified that neither Salerno nor Traylor pose a threat to others in the institution, nor do they threaten safety in the institution. According to Dr. Main, Salerno

and Traylor's refusal to participate in therapy and discuss their sex crimes and sex lives affects the safety of other residents or the safety of staff "only indirectly and subtly."

### 3. Treatment Refusal and Release from the STU

From 1999 to April 2012, 648 persons have been civilly committed to the STU. According to Dr. Main, about 90 persons have been conditionally released from the STU since its inception in 1999. Of the approximate 90 persons conditionally released, 29 have been released with conditions per Treatment Team recommendation and 47 have been discharged by court order, without the recommendation of the Treatment Team. Of those conditionally discharged, Dr. Main testified that he knew of six people who have violated the terms of their conditional release, but none who have sexually reoffended.

From August 1998 to August 26, 2012, a total of 65 residents of the STU have been classified as treatment refusers at some point. Of these 65, only four have been classified as "released": two by death and two for failing health, who have since died. A total of five out of the 65 may have gone back into treatment. There is no evidence provided by the parties to show how many of the 65 treatment refusers were classified as such solely because they refused to discuss their past sexual histories and sex offenses.

In his deposition for this litigation, Dr. Main acknowledged that lengthened detention is a consequence of a resident's remaining silent and therefore being deemed a treatment refuser. The Defendants likewise acknowledged that "refusing to engage in sex offender treatment is likely to extend the time a resident remains at the STU since nothing other than age or a change in his physical condition will change the risk that he will sexually reoffend that resulted in his commitment to the STU in the first place."

In general, if the Treatment Team of a person who has been civilly-committed determines that the person's mental health has changed so that he is not likely to engage in sexually violent crimes if released, the team is to recommend that the Department of Human Services petition the New Jersey state courts for discharge. *N.J.S.A.* 30:4-27.36. However, even without the recommendation of the treatment team, a resident of the STU may file a petition for discharge. *Id.* All residents at the STU are entitled to an annual review hearing regarding whether their civil commitment should be continued. *N.J.S.A.* § 30:4-27.35. Ultimately, the decision about whether a resident at the STU should be discharged rests with the New Jersey courts.

## II.  DISCUSSION

A.  Legal Standard

Courts will enter summary judgment only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P.* 56(a). *See also Azur v. Chase Bank, USA, Nat'l Ass'n*, 601 F.3d 212, 216 (3d Cir. 2010) (quoting *Nicini v. Morra*, 212 F.3d 798, 805–06 (3d Cir. 2000) (en banc) (citing *Fed. R. Civ. P.* 56)). An issue is "genuine" if supported by evidence such that a reasonable jury could return a verdict in the non-moving party's favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact has the potential to alter the outcome of the case. *See id.* at 252; *DeShields v. Int'l Resort Props. Ltd.*, 463 F. App'x 117, 119 (3d Cir. 2012) (citation omitted).

In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts "in the light most favorable to the

[non-moving] party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *DeShields*, 463 F. App'x at 119. The judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249.

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion." *Celotex v. Catrett*, 477 U.S. 317, 323 (1986). The non-moving party then carries the burden to "designate 'specific facts showing that there is a genuine issue for trial.'" *Id*. at 324. Moreover, the non-moving party may not rest upon the mere allegations or denials of its pleading. *Id*. at 324; *Maidenbaum v. Bally's Park Place, Inc.*, 870 F. Supp. 1254, 1258 (D.N.J. 1994). The non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. A mere "scintilla of evidence ... will be insufficient." *Anderson*, 477 U.S. at 252; *Azur*, 601 F.3d at 216 (the non-moving party must "set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor"). However, summary judgment may be granted if the nonmoving party's "evidence is merely colorable or is not significantly probative." *Anderson*, 477 U.S. at 249–50; *Dwyer v. Cappell*, ___ F. Supp.2d __, 2013 WL 3270385, *2-3 (D.N.J. 2013).

B. <u>First Amendment Right Against Compelled Speech</u>

As mentioned in the procedural history above, the Third Circuit remanded this case for determination of Plaintiffs' First Amendment claims for prospective relief. *Salerno*, 449 F. App'x at 123. Plaintiffs principally assert that their First Amendment right against compelled speech is violated because Defendants require Plaintiffs to discuss their sexual histories and past sex offenses during the course of group therapy. Plaintiffs continue to invoke their First

Amendment rights in refusing to talk about their sex lives and sex offense history. As a result of their refusal, Plaintiffs allege that they have been denied certain privileges or incentives afforded to other residents who comply with the treatment program requirements to discuss their sexual histories. Most significantly, Plaintiffs allege that they have been unable to advance through the treatment phases, which has increased their detention indefinitely, as a consequence of their refusal to discuss their past sexual histories. Plaintiffs contend that these deprivations of liberty are so great as to rise to the level of compulsion that violates the First Amendment.

On the other hand, Defendants argue that Plaintiffs' First Amendment rights are not infringed by the withholding of certain privileges for refusing to participate in a program that uses an "incentive-for-participation system" to foster standard sex offender treatment. Citing Dr. Main's professional opinion, Defendants maintain that "admission to and discussion of all sexual offenses is critical to successful treatment" of residents at the STU. Dr. Main opines that incentives to cooperate are necessary to induce an otherwise "treatment-resistant" group to participate in a treatment program, and that giving treatment "refusers" the same privileges as treatment participants would undermine the entire treatment program.

a. *First Amendment Rights of Civilly Committed Persons*

To determine the substantive rights of a person involuntarily committed to a state institution, the interests of the individual are balanced against the interests of the state. *Youngberg v. Romeo*, 457 U.S. 307, 320 (1982). In a prison or institution housing pretrial detainees, the "essential" state interests include "maintaining institutional security and preserving internal order." *Bell v. Wolfish*, 441 U.S. 520, 546 (1979). The United States Supreme Court recognized that "officials must be free to take appropriate action to ensure the safety of inmates and . . . personnel and to prevent escape or unauthorized entry." *Id*. at 547. In contrast,

"[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg*, 457 U.S. at 321–22.

However, the state's interest in maintaining order and security is not punitive in purpose or character, and remains valid in institutions of civil commitment. *See Bell*, 441 U.S. at 540 ("The Government . . . has legitimate interests that stem from its need to manage the facility in which the individual is detained [pretrial].").  The state also has an interest in treating the civilly-committed individual.  "[T]he dual goals of involuntary commitment [are] to provide care and treatment to those unable to care for themselves and to protect the individual and society from those who pose a danger to themselves and others because of mental illness." *Ahlers v. Rabinowitz*, 684 F.3d 53, 61 (2d Cir. 2012) (quoting *Goetz v. Crosson*, 967 F.2d 29, 34 (2d Cir. 1992)).

In the context of a prisoner's First Amendment rights, the Supreme Court has established that policies infringing on First Amendment rights are valid if "reasonably related to legitimate penological interests." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987).  While courts of appeals have been reluctant to articulate a specific standard applicable to civilly committed individuals, they have found that restrictions are permissible so long as they advance the state's interest in security, order, and rehabilitation. *Ahlers*, 684 F.3d at 64; *Bohannan v. Doe*,___ F. App'x ___, 2013 WL 2631197 (5th Cir. 2013).  Any restriction or regulation on civil detainees' constitutional rights, however, cannot be "punitive." *See Jones v. Blanas*, 393 F.3d 918, 931–32 (9th Cir. 2004); *Marentz v. Baca*, No. CV 08-00340 VBF (AJW), 2012 WL 7018230, at *11 (C.D. Cal. Oct. 9, 2012).

Thus, involuntarily-confined residents at the STU are not entitled to the full panoply of

First Amendment rights enjoyed by citizens free from restraint. [4] "Any form of involuntary

---

[4]        Plaintiffs rely substantially upon cases involving free citizens in their argument concerning the First Amendment's right to be free from compelled speech. *See West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) (enjoining the Board of Education from compelling students to salute the flag and recite the Pledge of Allegiance); *Riley v. National Federation of the Blind*, 487 U.S. 781 (1988) (striking down a state law that required professional fund raisers to disclose to potential donors what percentage of charitable contributions they had retained following prior solicitations); *Wooley v. Maynard*, 430 U.S. 705 (1977) (enjoining the State of New Hampshire from prosecuting plaintiffs who chose to obscure the words "Live Free or Die" on state license plates). *See also F.C.C. v. League of Women Voters*, 468 U.S. 364, 398 (1984) (the Public Broadcasting Act provision forbidding a noncommercial educational broadcasting station which receives a grant from the Corporation for Public Broadcasting to "engage in editorializing" violates First Amendment free speech clause); *Cradle of Liberty Council v. City of Philadelphia*, 851 F. Supp. 2d 936, 947 (E.D. Pa. 2012) (city's attempt to evict Boy Scouts from public building for denial of membership to openly homosexual men was an impermissible attempt to regulate speech and therefore violative of the unconstitutional conditions doctrine); *Alliance for Open Soc'y Intl, Inc. v. U.S.A.I.D.*, 651 F.3d 218 (2d Cir. 2011) (court invalidated provision of the United States Leadership Act of 2003 denying funds to any group that does not explicitly oppose prostitution); *R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) (city ordinance prohibiting bias-motivated disorderly conduct was held facially invalid under the First Amendment); *Arkansas Writer's Project, Inc. v. Raglund*, 481 U.S. 221 (1987) (finding that a state's sales tax scheme violated First Amendment by taxing general interest magazines but exempting newspapers and religious, professional, trade and sports journals); *First Nat'l Bank v. Bellotti*, 435 U.S. 765 (1978) (state statute prohibiting corporate expenditures regarding individual income tax referenda violated the First Amendment); *Davis v. Fed. Election Com'n*, 554 U.S. 724 (2008) (finding that the U.S. House of Representatives' Bipartisan Campaign Reform Act's expenditure thresholds and disclosure requirements violated the First Amendment); *Sable Communications of California, Inc. v. FCC*, 492 U.S. 115 (1989) (Communications Act "dial-a-porn" provision's denying adult access to telephone messages which were indecent but not obscene far exceeded that which was necessary to limit access of minors to such messages and, therefore, violated the First Amendment). Plaintiffs also rely on a recent Third Circuit case dealing with the First Amendment right against compelled speech, *Miller v. Mitchell*, 598 F.3d 139 (3d Cir. 2010).  In *Miller*, teenagers who had come under scrutiny by the district attorney for "sexting" via their cell phones, were given a choice to either attend an educational program which required the students to write an essay explaining how their actions were wrong, or face child pornography charges.  The Third Circuit held that "violation of the First Amendment Right against compelled speech occurs" even when government compulsion does not consist of a "direct threat."  *Miller,* 598 F.3d at 152.  Because this case involves civilly-confined persons, the Court will apply the test laid out in *Turner v. Safley*, 482 U.S. 78, 89 (1987), rather than the First Amendment cases set forth above.

confinement, whether incarceration or involuntary commitment, may necessitate restrictions on the right to free speech." *Beaulieu v. Ludeman*, No. 11–1845, 2012 WL 3711342, at *19 (8th Cir. August 29, 2012) (quoting *Martyr v. Bachik*, 755 F. Supp. 325, 328 (D.Or. 1991)); *see also Hydrick v. Hunter*, 500 F.3d 978, 991 (9th Cir. 2007) (noting that "[a]s is the case with prisoners, civilly committed persons retain those First Amendment rights not inherently inconsistent with the circumstances of their detention"), *vacated on other grounds, Hunter v. Hydrick*, ___ U.S. ___, 129 S.Ct. 2431 (2009).

Generally, when evaluating whether detention facility policies permissibly limit First Amendment freedoms, the Supreme Court has directed courts to consider whether the challenged restriction was "reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987); *Turay v. Cunningham*, No. C11-5618 BHS/KLS, 2013 WL 811420, at *4 - *5 (W.D. Wash. Jan. 2, 2013). The *Turner* court provided four factors to guide reviewing courts in applying this test: (1) the existence of a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it; (2) the existence of alternative means of exercising the right that remain open to prison inmates; (3) the impact that accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally; and (4) the absence of ready alternatives as evidence of the reasonableness of the regulations. *Id*. at 89–91. In considering these factors, the court should defer to "the informed discretion of corrections officials." *Id*. at 90; *Bull v. City & County of San Francisco*, 595 F.3d 964, 971 (9th Cir. 2010).

Courts in the Third Circuit and other circuits have consistently adopted the *Turner* test to analyze First Amendment claims brought by civilly committed persons. *See Rivera v. Rogers*, 224 F. App'x 148, 150-51 (3d Cir. 2007) (ruling that plaintiff's classification as a sexually

violent predator under New Jersey's SVPA renders his status similar to that of a prisoner, and thus his First Amendment claim may be analyzed by looking to case law interpreting a prisoner's rights); *see also Hydrick*, 500 F.3d at 991-92 (Ninth Circuit using *Turner* to support the proposition that "[a]s is the case with prisoners, civilly committed persons certainly retain those First Amendment rights not inherently inconsistent with the circumstances of their detention"); *Balkum v. Sawyer*, No. 6:06–CV–1467, 2011 WL 5041206, (N.D.N.Y. October 21, 2011) at *5– 6 (collecting cases and concluding that it would apply the *Turner* test for assessing a civilly-committed person's challenge to institutional policy on First Amendment grounds); *see also Turay*, 2013 WL 811420; *Rivera*, 224 F. App'x at 151 (Third Circuit applying *Turner* where SVP challenged STU's policy of inspecting packages); *Yeldon*, 2010 WL 983819, at *7 (using *Turner* where sex offender patient civilly confined at state facility challenged restrictions on his phone, mail, and news media).

Furthermore, the *Turner* test mirrors the test for evaluating a civilly-committed person's due process claims as articulated in *Youngberg*, 457 U.S. at 321, because both tests involve "balanc[ing] the constitutional interests of confined persons against the legitimate interests of the state-run institution in which they reside." *Graham v. Main*, No. 10–5027(SRC), 2011 WL 2412998 at *13 n. 11 (D.N.J. 2011); *Yeldon v. Hogan*, No. 9:08–CV–769 (NAM/RFT), 2010 WL 983819, *7 (N.D.N.Y. Mar. 15, 2010).[5] Thus, in addressing the issue of whether Plaintiffs have

---

[5]     Indeed, as observed by the State Defendants here, in *Youngberg*, the Supreme Court "emphasize[d] that courts must show deference to the judgment exercised by a qualified professional [which] is presumptively valid," unless the professional decision is "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on that judgment." *Youngberg*, 457 U.S. at 322. Moreover, "[i]t is not appropriate for the courts to specify which of several professionally acceptable choices should have been made." *Id.* at 321. The State Defendants further contend that unlike ordinary civil detainees, Plaintiffs are legally adjudicated

a First Amendment right against compelled speech in the STU treatment program that was violated by Defendants, the Court will apply the *Turner* factors.

> b. *Application of the* Turner *Test*

The first factor asks whether there is a valid, rational connection between the STU regulation and the legitimate state interest said regulation purportedly advances. *Turner*, 482 U.S. at 89. The Third Circuit has recognized as "indisputable that [the] STU has a legitimate interest in . . . the rehabilitation of its patients." *Rivera*, 224 F. App'x at 151. Further, as the Supreme Court noted in *McKune v. Lile*, 536 U.S. 24, 33 (2002), "[s]tates . . . have a vital interest in rehabilitating convicted sex offenders." Defendants have a legitimate interest in treating those residents at the STU who are amenable to treatment so that they can be released without posing a danger to society.

Plaintiffs counter that the statistical evidence shows no rational connection between the goal of rehabilitation and the actual operation at the STU. Rather, Plaintiffs contend that the STU program is a sham and that its real objective is to detain indefinitely, and not to rehabilitate. In support of their contention, Plaintiffs note that less than 5% of the total STU population from 1999 through 2011, or 29 out of 639 residents, have been released after recommendation by the Treatment Team, with conditions imposed on their release. However, Dr. Main has testified that the "numbers of discharges are slowly but steadily increasing each year." Moreover, for those individuals who have been conditionally released by the Treatment Team, there has been zero recidivism. Accordingly, this Court finds that the statistical evidence does not reveal the state's rehabilitative interest to be illusory, irrational or arbitrary. The fact that successes in treatment

---

SVPs who are now confined precisely "because of their danger to society until such time as their risk to reoffend has been mitigated sufficiently by treatment."

sufficient for discharge are small in number does not mean that the goal is a sham nor that the treatment is unrelated to reaching for that goal.

The second *Turner* prong addresses whether there are alternative means for residents at the STU to exercise their First Amendment right against compelled speech. Plaintiffs suggest as alternatives a program that would have the STU admit to treatment those residents who refuse to speak of their past, or a program that allows the residents to go untreated while retaining equal privileges with those who do accept treatment, plus eligibility for release on other grounds. Plaintiffs have presented no evidence that these alternatives would be effective.[6]

Defendants contend that these proposed alternatives are not reasonable for the institution as a whole that must deal with a generally treatment-resistant population, and would frustrate the ultimate goal of rehabilitation for the entire cohort of residents. Specifically, Defendants argue that to accord full privileges to non-participants in treatment would undermine the STU's overall treatment program because it would reward obduracy and eliminate any incentive for participation. This would thwart the state's legitimate interests of rehabilitation for an otherwise treatment-resistant population, and have a significant and adverse "ripple effect" on other residents who might be moved to participate in the STU treatment program. See *McKune*, 536 U.S. at 47-48 ("If the State found it was forced to graduate prisoners from its rehabilitation program without knowing what other offenses they may have committed, the integrity of its

---

[6]     Pro bono counsel Cynthia M. Jacob has done an outstanding job of identifying and analyzing all the issues in this case and she is to be applauded for her dedication demonstrated both by the legal briefs filed and at oral argument. While Ms. Jacob was unable to find any programs that might serve as a model whereby otherwise fully-compliant civilly committed sex offenders who earnestly wish treatment could participate in a full treatment program with a lesser degree of self-confession about prior sexual misconduct, it would be a forward thinking approach if the states who have these kinds of facilities could explore with mental health professionals such a program.

program would be very much in doubt. If the State found it had to comply by allowing respondent the same perquisites as those who accept counseling, the result would be a dramatic illustration that obduracy has the same rewards as acceptance, and so the program itself would become self-defeating, even hypocritical, in the eyes of those whom it seeks to help.  The Fifth Amendment does not require the State to suffer these programmatic disruptions when it seeks to rehabilitate those who are incarcerated for valid, final convictions.").  Further, Dr. Main has also averred that "admission to and discussion of all sexual offenses is critical to successful treatment," and "it is only in this manner that the patient can begin to understand and control his sexually violent behavior."

Moreover, to some extent, the STU does accommodate those residents who choose to exercise their right to refuse participation in the treatment program, in a manner that does not undermine the efficacy of offering incentives to those who do accept treatment.  Dr. Main attested that, "[a]s an inducement to those who refuse to participate" to "reconsider their position and provide them with some source of income, a limited number of hours of institutional work (currently two hours per week) are offered to those who agree to participate in the Treatment Orientation group.  Discussion of sexual offenses is not required since, as the name implies, Treatment Orientation is designed to introduce newly committed residents to treatment concepts and what is expected of them to successfully advance in treatment.  Participation is entirely voluntary."

Under the third *Turner* factor, the Court assesses the impact that accommodation of Plaintiffs' asserted First Amendment right will have on other residents and the STU program. When "accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or prison staff, courts should be particularly deferential to the informed discretion" of

state officials. *Turner*, 482 U.S. at 90. As noted above, accommodation of Plaintiffs' asserted right to have the same privileges given to those who refuse the treatment program as to those who accept the treatment program would have a detrimental ripple effect undermining the efficacy of the treatment program overall. While Plaintiffs also argue that there should be a different form of treatment that does not require the admission of past sexual offense or sexual history, none has been adduced. Moreover, this Court will not micromanage the content of the treatment programs devised by professionals.

Under the fourth factor, the Court must consider whether there are alternatives that would fully accommodate the Plaintiffs' rights at *de minimis* cost to the STU's legitimate interest in rehabilitation. Because the disclosure requirement in the STU treatment program is an essential component of treatment, there is a necessity to induce participation in this treatment program by granting incentives. Giving the same incentives to those who refuse to speak in therapy would undermine the effectiveness of the incentives needed to induce the greatest participation in the program.

Plaintiffs contend that there would be no adverse effect by accommodating Plaintiffs First Amendment right not to speak because they currently are exercising this right without affecting the other residents. However the other residents know that Plaintiffs forfeit certain privileges for non-participation in the treatment program. The current situation does not test the effect on other residents if they were to see that non-participation yields identical privileges as participation. Thus, weighing all of the *Turner* factors, the STU's incentive structure in its treatment program does facilitate New Jersey's compelling interest of rehabilitation as set forth in the SVPA. *See Overton v. Bazzetta*, 539 U.S. 126, 132 (2003).

c. *Denial of Privileges at the STU*

Further, while Plaintiffs have the right to refuse to speak and thus not advance in the treatment program,[7] the State can condition the privileges of progression in the program on full participation without violating Plaintiffs' First Amendment right against forced content speech. The Supreme Court's decision in *McKune* considered an analogous claim based on the Fifth Amendment's right against compelled incrimination. In *McKune*, a criminally convicted sex offender brought a § 1983 action against prison officials, alleging that Kansas' sexual abuse treatment program violated his Fifth Amendment right by requiring him to make admissions concerning his crime of conviction and other past offenses. The Court first noted that Kansas' treatment program was a valid "clinical rehabilitative program" that served a "legitimate penological objective" of rehabilitation. *McKune*, 536 U.S. at 34. Examining the *Turner* factors, the Court, in a plurality opinion, ruled that the adverse consequences faced by the plaintiff for refusing to make admissions necessary to participate in the program were not so severe as to amount to compelled self-incrimination. *Id.* at 38-39. Specifically, the refusal to participate in the program did not extend plaintiff's term of incarceration, nor did it affect his eligibility for good-time credits or parole. Rather, the refusal to participate would result in his transfer from the medium security unit where the program was conducted to a less-desirable maximum security unit. *Id.* at 38. The Court found that this transfer did not amount to punishment for exercising his Fifth Amendment right, nor did the transfer and its resultant loss of certain privileges constitute a significant and atypical hardship or implicate a liberty interest. *Id.* at 37-40.

---

[7]     Dr. Main avers that "[a]lthough admission to and discussion of all sexual offenses is critical to successful treatment, no patient is 'forced' to admit such offenses or forced to participate in treatment. Participation in treatment is entirely voluntary."

Following *McKune*, the Superior Court of New Jersey examined a similar Fifth Amendment claim invoked by an inmate confined at New Jersey's Adult Diagnostic and Treatment Center for convicted sex offenders. *See Bender v. New Jersey Dept. of Corrections*, 356 N.J. Super. 432 (App. Div. 2003). The inmate challenged State's removal of good time credits for his failure to fully participate in the sex offender treatment program. The state court considered *McKune*, but found that the denial of good time and work credits lengthened the inmate's incarceration for his refusal to answer questions about his criminal history, and thus violated his Fifth Amendment right. *Bender*, 356 N.J. Super. at 439-40.9

As discussed above, the STU treatment program is related to the rehabilitative purpose for which the residents are detained. As in *McKune*, the adverse consequences or loss of privileges, such as an institutional job, DVD player and video game system, are not themselves so severe or extreme as to constitute an atypical or significant hardship, or implicate a liberty interest. *See McKune*, 536 U.S. at 39 (the loss of personal television, less access to facility organizations and gym, reduction in job opportunities and canteen privileges, and restrictions on visitation rights, do not trigger procedural due process protections).

The Third Circuit, in three non-precedential opinions, has squarely addressed this question, and found that denial of privileges such as an institutional job, for refusing to participate in sex offender treatment at the STU does not amount to a compulsion to speak in violation of the First Amendment. In *Aruanno v. Spagnulo* [8] the Third Circuit addressed a *pro se* complaint brought by a resident at the STU who was denied an institutional job and other privileges because he refused to participate in sex offender treatment. The Circuit stated that

---

[8]     As discussed above, Mr. Aruanno's case was originally consolidated with the Plaintiffs here before the Third Circuit. However, the Third Circuit upheld the dismissal of his claims by the District Court.

"these consequences for refusing to describe his past sexual behavior are not so severe that participation in treatment is essentially compulsory . . . [and] we cannot conclude that Aruanno is being compelled to speak in violation of the First Amendment." *Aruanno*, 292 F. App'x at 186 (citing *McKune*, 536 U.S. at 49).[9] The Circuit reiterated this analysis in *Aruanno v. Velez*, and stated:

> As in his prior action . . . Aruanno asserted retaliation by STU defendants, in the form of the denial of a job, for exercising his constitutional rights to remain silent regarding a crime that he maintains that he did not commit. As we found in that case, denial of a job for failure to admit to the crime for which he is confined does not amount to a "compulsion" to speak under the First and Fifth Amendment protections. Because the conduct leading to the alleged retaliation is not within the scope of constitutional protections, Aruanno cannot prevail on his retaliation complaint.

500 F. App'x 126, 128 (3d Cir. 2012). Most recently, the Third Circuit, in addressing another complaint filed by Mr. Aruanno, stated "denial of a prison job for failure to admit to the crime for which [Aruanno] is confined does not amount to a 'compulsion' to speak in violation of the First and Fifth Amendment." *Aruanno v. John/Jane Does*, No. 13-1451, 2013 U.S. App. LEXIS 17653, at *5 (3d Cir. Aug. 23, 2013).

The Third Circuit's analysis in the *Aruanno* line of cases is not precedential, but is persuasive. *See United States v. Barney*, 792 F. Supp. 2d 725, 729 (D.N.J. 2011) ("[D]istrict courts may rely on non-precedential opinions as strongly persuasive authority."), *aff'd*, 672 F.3d 228 (3d Cir. 2012). The loss of such privileges as an institutional job, a DVD player, and a CD

---

[9]     The Third Circuit also held that unless the conditions or loss of liberty is extreme, it does not violate due process. *See Deavers v. Santiago*, 243 F. App'x 719, 721 (3d Cir. 2007) (applying *Sandin v. Connor*, 515 U.S. 472 (1995), to segregated confinement of civilly committed sexually violent predators); *see also Rivera*, 224 F. App'x at 150-51 (finding that the *Sandin* standard of atypical and significant hardships has been applied with equal force to civilly committed residents, and "sexually violent predator" status has been deemed similar to that of prisoners).

player, for non-participation does not implicate a constitutional deprivation of liberty so severe as to violate Plaintiffs' First Amendment right against compelled speech.

        d.  *Lengthened Detention*

The more nuanced question is whether the non-advancement in the program caused by refusal to speak constitutes an extreme loss of liberty because it could lead a court not to find sufficient rehabilitation to order release.[10] Unlike *Bender* and *McKune*, this case does not involve incarceration for a discrete term, but rather civil commitment for an indeterminate term to be set by the court, not by the state. The court determines when a civilly committed resident at the STU is no longer highly likely to sexually reoffend so that he can be conditionally discharged. Discharges occur both with and without the recommendation of the STU officials. *N.J.S.A* 30:4-27.32(c)(1); *N.J.S.A.* 30:4-27.36(a). Plaintiffs are entitled to a discharge hearing even in the absence of a recommendation by the Treatment Team at the STU. Thus, the issue is not whether Defendants deny the discharge but instead whether the <u>court</u> could find that Plaintiffs have mitigated their risk enough to no longer be highly likely to sexually reoffend if discharged.[11]

---

[10]     Plaintiffs' arguments concerning their lengthened detention did not appear in their original complaints. They may therefore be outside of the scope of the remand by the Third Circuit. This is bolstered by the fact that Plaintiffs were denied the opportunity to amend their complaints before this Court after the remand.

[11]     The record reveals fact questions as to whether Plaintiffs' non-progression in the STU program is solely based on their refusal to disclose their past sexual behavior and crimes, or whether it stems an obdurate attitude toward participation in therapy and group sessions in a meaningful way so as to reduce their risk of sexually reoffending. Plaintiff Salerno has been on treatment refusal status since 2004 for "refusing to participate in process groups, modules, or self-help groups and he has yet to complete any of the written programmatic requirements. He denies his entire offense history or having a deviant arousal. As a result, he will not consider the possibility of reoffending and is, therefore, unable to identify any relapse prevention interventions."

Similar questions of fact apply to Plaintiff Traylor, who, since his arrival at the STU, has

Plaintiffs here have been civilly committed, pursuant to a court adjudication that they are sexually violent predators likely to reoffend under the SVPA, for a therapeutic and indefinite term to be determined by the court. Thus, the "indefiniteness" of their term of commitment is not determined by whether they exercise their First Amendment right against compelled speech, but instead by whether they continue to present a risk of sexually reoffending, which is reviewed annually by the court (with or without the STU recommendation for conditional discharge) pursuant to *N.J.S.A.* 30:4-27.35.11. The adverse consequence of indefinite detention is not applied to Plaintiffs by Defendants. The duration of detention is rather determined by the New Jersey courts, and such detention is not necessarily increased because they have exercised their First Amendment right not to speak. Plaintiffs also have the right to demonstrate to the court why they meet the standard for discharge under state statute. Defendants do not control the outcome of this proceeding. Therefore, they cannot be found to have violated Plaintiffs' First Amendment rights as a result of a proceeding which they do not control.

C. Retaliation Claim

Finally, Plaintiffs contend that Defendants have retaliated against them for exercising

---

allegedly "consistently refused to participate in Sex Offender Specific Treatment, which is the primary method expected to reduce one's risk to sexually recidivate. He is consistently approached on a monthly basis by social work staff and afforded the opportunity to express any concerns or issues for which he may require assistance. ... [He] has been repeatedly encouraged to ponder his future goals and to consider whether or not he is interested in proactively attempting to ameliorate his risk to sexually recidivate by engaging in any of the multiple components of treatment offered at the [STU] (process group, self-help groups, basic education, rehabilitative activities, etc.). Despite being civilly committed for more than 10 years, Mr. Traylor has yet to attend any treatment process groups in any meaningful fashion. He has however attended a few module groups only to quickly withdraw. While on the unit or in the yard, Mr. Traylor rarely socializes and is often observed alone. . . . Finally, there is no evidence to suggest that he has independently pursued sex offender treatment in that he has not submitted any written programmatic requirements, expressed any knowledge of treatment concepts nor does he attend any self-help groups, which are intermittently offered on his housing unit."

their First Amendment right against compelled speech. To support a retaliation claim, Plaintiffs must show that the conduct provoking the alleged retaliation was constitutionally protected, that they suffered some "adverse action" at the hands of the prison officials "sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights," and that the constitutionally protected conduct was a substantial motivating factor in Defendants' conduct. *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001) (alteration in original) (internal quotation marks omitted). *See also Smith v. Hayman*, 489 F. App'x 544, 548 (3d Cir. 2012); *Monroe v. Phelps*, No. 12–3489, 2013 WL 1397820, *2 (3d Cir. Apr.8, 2013). Whether the allegedly adverse action was "'sufficient to deter a person of ordinary firmness from exercising his constitutional rights' is an objective inquiry and ultimately a question of fact." *Bistrian v. Levi*, 696 F.3d 352, 376 (3d Cir. 2012) (quoting *Rauser*, 241 F.3d at 333). If Plaintiffs can establish a prima facie case of retaliation, then the burden shifts to Defendants "to demonstrate that even without the impetus to retaliate he would have taken the action complained of." *Hartman v. Moore*, 547 U.S. 250, 260 (2006); *Monroe*, *supra*.

Here, Plaintiffs allege that Defendants retaliated against them for refusing to discuss their sexual histories in therapy by placing them on refusal status which removes certain privileges and prevents Plaintiffs from advancing in treatment so that they are effectively indefinitely detained. As discussed above, Plaintiffs' conduct provoking the allegation retaliation is not constitutionally protected.

Even if it were, Plaintiffs have elected to invoke their First Amendment right not to speak for many years despite the "adverse action" of withholding of privileges that are used as incentives in the STU's treatment program. Thus, Plaintiffs cannot meet the second factor because these adverse actions have not deterred Plaintiffs from not participating in treatment,

suggesting that a person of ordinary firmness would not be deterred from exercising the protected conduct. *See Monroe v. Phelps*, No. 12-3489, 2013 WL 1397820, at *2-3 (3d Cir. Apr. 8, 2013) ("We agree with the District Court that the record does not support a finding that Monroe was subject to adverse actions of the type that would deter a prisoner of ordinary firmness from exercising his constitutional rights. As the District Court pointed out, Monroe filed several grievances after the January 7, 2008 incident, thus showing that he was not deterred from exercising his First Amendment rights."). *See also Keys v. Kramer*, No. 3:04CV823, 2006 WL 1670218, *6 (M.D.Pa. Jun. 6, 2006) ("Plaintiff continued to file grievances against prison staff with the prison, and he continued (up to the present time) to file civil rights actions with this Court. In fact, Plaintiff can hardly claim that he was deterred."); *Bartelli v. Bleich*, No. Civ.A3:CV04-0899, 2005 WL 2347235, *3 (M.D.Pa. Sep. 26, 2005) ("Plaintiff's civil rights lawsuits and complaints against prison officials belie any assertion that defendant's alleged threats affected Plaintiff's exercising his First Amendment Rights.").

Thus, Plaintiffs have not satisfied the second factor of their retaliation claim. Defendants are granted Summary Judgment on this claim.

D.  Notice

Although the conditioning of privileges on participation in sex offender treatment at the STU does not violate Plaintiffs' constitutional rights, the lack of notice in the Residents' Guide raises serious constitutional concerns. The Department of Human Services, in conjunction with the Attorney General of New Jersey, is to modify the Residents' Guide so as to alleviate those concerns. First, the Residents' Guide is to explicitly make clear that residents are more likely to be released if they participate in sex offender treatment. Second, the Residents' Guide is to provide notice that residents at the STU cannot be prosecuted under the doctrine of Double

Jeopardy for revealing crimes of which they have already been convicted. It is to further provide that residents will be given the opportunity to discuss possible sex crimes of which they have not been convicted in a sufficiently guarded way as to avoid future prosecution for such crimes.

## III.    CONCLUSION

For the foregoing reasons, the Court will grant Defendants' Motion for Summary Judgment, and deny Plaintiffs' Cross-Motion for Summary Judgment. This action will be dismissed in its entirety accordingly. An accompanying Order is filed herewith.


s/ Faith S. Hochberg
FAITH S. HOCHBERG
United States District Judge